ALABAMA STATE DOCKS DEPARTMENT, Plaintiff-Appellee,

v.

BUNGE CORPORATION, Defendant-Appellant.

No. 80–7421.

United States Court of Appeals, Fifth Circuit. Unit B

Sept. 4, 1981.

G. Sage Lyons, Marion A. Quina, Jr., Mobile, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, FRANK M. JOHNSON, Jr. and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, the Bunge Corporation ("Bunge"), appeals from the judgment in favor of the Alabama State Docks Department in the amount of $30,298.16 plus interest. This amount represents the storage fee for Bunge's corn, pursuant to a tariff issued by the Docks Department under the authority of the Shipping Act, 46 U.S.C.A. §§ 801–842 (1975 and Supp. 1981). Bunge protests the amount of the fee on the ground that the rate was changed during the period of storage. Bunge argues that it was improper to charge Bunge a higher rate, as of the effective date of the new tariff, solely because Bunge's corn had already been in storage for a length of time. Accordingly, Bunge maintains that it owes only $10,158.65 in storage fees. We affirm.

## I. FACTS

The material facts are not in dispute. In the fall of 1977, Bunge stored a quantity of corn in the grain elevators owned and operated by the Alabama State Docks Department in Mobile, Alabama. At that time, the Docks Department tariff provided that, following a ten-day free time, storage charges on grain would be calculated at the rate of one-tenth of a cent per bushel per day. Because the United States Department of Agriculture and the Food and Drug Administration suspected that the grain was contaminated with aflatoxin mold, the grain remained stored for an extended period of time. On May 6, 1978, a new storage tariff became effective. The new tariff, called Item No. 5-A of Supplement No. 4, reads:

Hand, Arendall, Bedsole, Greaves, Johnston, William A. Moseley, Alex F. Lankford, III, Mobile, Ala., for defendant-appellant.

Storage Charges

Except as otherwise provided, storage charges for grain . . . ., after the expiration of 10 days free time . . . will be assessed as follows:

| | Per Bu. Per Day |
|---|---|
| 1st 60-calendar-day period . . . . . . . . | 1/10¢ |
| 2nd 60-calendar-day period . . . . . . . . | 1/5¢ |
| 3rd and each successive 60-calendar-day periods . . . . . . . . . . . | 2/5¢ |

The grain was still stored as of the effective date of this amendment and remained stored until July 24, 1978, when the last of it was removed. The Docks Department submitted a bill in the net amount of $30,-298.16, calculated at the rate of two-fifths cents per bushel per day for storage from May 6 to July 24, 1978. The Docks Department's position was that since the grain had been stored for more than 120 consecutive days prior to May 6, 1978, the third or highest rate under the new tariff applied. Bunge maintains that this is an erroneous interpretation of the amended tariff. It believes that the first 60-day period at the 1/10¢ rate should commence to run from the effective date of the amendment and that, by its calculations, it owes only $10,158.65 in storage charges.

On cross motions for summary judgment, the district court held that "the rate periods are measured from the expiration of the free time, and not from any other date." Accordingly, it adopted the Docks Department's interpretation of the tariff and granted its motion for summary judgment. On appeal, Bunge challenges the district court's interpretation of the tariff. In addition, it claims that the district court's interpretation of the tariff violates the Shipping Act's requirement that tariffs be "just and fair" in that Bunge was treated unequally when it was deprived of the lower rates for the first 120 days after May 6, 1978. Bunge also claims that the district court has given retroactive effect to its amended tariff, thereby violating its right to due process.

## II. DISCUSSION

■ Our first task is to separate the issue of the proper interpretation of the tariff from the other issues of just and fair treatment and retroactivity. In general, the ordinary rules of contract interpretation apply in interpreting the language of tariffs. *See Atchison, Topeka & Santa Fe Railway Co. v. United States,* 572 F.2d 843, 849 (Ct.Cl.1978). In certain cases, however, the rules of statutory construction also apply in interpreting tariffs. *See State of Israel v. Metropolitan Dade County, Florida,* 431 F.2d 925, 928–29 (5th Cir.1970). Looking solely to the amended tariff, we find ourselves in agreement with the district court that the tariff is not ambiguous and that the rate schedule contained therein applies after the expiration of ten days free time. Bunge argues that it should receive the benefit of the lower 1/10¢ rate for the first 60 days after May 6, 1978, and that it should receive the benefit of the 1/5¢ rate for the next 60 days. Somewhat inconsistently, Bunge does not argue that it is entitled to a new 10 days free time as of the May 6, 1978, effective date of the new tariff. Bunge's interpretation is clearly at odds with the language of the amendment itself. The amended tariff provides that "storage charges for grain . . . after expiration of 10 days free time . . . will be assessed as follows." The tariff establishes the "expiration of 10 days free time" as the time from which the first 60 days for the lowest rate will run, etc. It is undisputed that Bunge's free time expired sometime in September of 1977. Thus, the 120 days of potentially lower rates under the tariff had expired long before the May 6, 1978, effective date of the tariff. We conclude that the tariff unambiguously imposes the 2/5¢ rate upon Bunge from and after the May 6, 1978, effective date. This interpretation comports with the purpose of the tariff. The progressive rates were intended to provide an incentive to encourage storage for shorter periods, or to compensate the Docks Department for loss of revenue associated with slow-moving grain (e. g., loss of fees related to moving grain in and out of storage).

■ Next, Bunge argues that the new tariff violates the Shipping Act's require-

ment that a tariff be "just and reasonable," 46 U.S.C.A. §§ 816 and 817, by treating it differently from those who stored their grain on or after May 6, 1978. This argument is without merit. Any difference in treatment is due solely to the length of time for which the grain is stored. It is not unjust or unreasonable to impose a progressive rate schedule based upon length of storage time.

 Finally, Bunge argues that the district court's interpretation of the amended tariff results in a retroactive application of the higher rates in violation of the due process clause. We do not agree. In the realm of statutory construction, it is well established that a "statute is not retroactive merely because it draws upon antecedent facts for its operation." *Lewis v. Fidelity & Deposit Company of Maryland*, 292 U.S. 559, 571, 54 S.Ct. 848, 853, 78 L.Ed. 1425 (1934); *Lohf v. Casey*, 466 F.2d 618 (10th Cir.1972); *C.F. Industries v. Transcontinental Gas Pipeline*, 448 F.Supp. 475 (W.D.N.C. 1978). The antecedent fact upon which the tariff at issue draws is the fact that Bunge had already had its grain in storage for a lengthy time. It is neither unreasonable nor discriminatory to make a distinction between one who has already stored his goods for a lengthy time and one who has stored goods for a lesser time or for no time at all. The proper purpose of the progressive rate was to provide an incentive for shippers to store their grain for a shorter time, thus increasing the availability of the facility for other users desiring to export grain, and also to compensate for loss of revenues associated with slow-moving grain. We conclude that the tariff at issue is not retroactive merely because it makes a distinction in rates based upon the antecedent fact of the length of storage.[1] *See Selden & Co. v. Board of Trustees of the Galveston Wharves*, 7 F.M.C. 679, 1964 A.M.C. 1621 (1964).

AFFIRMED.

GODBOLD, Chief Judge, dissenting:

I dissent from the majority's holding that the Docks Department grain storage tariff unambiguously charges Bunge at the rate of ⅖¢ per bushel per day for the days of storage after the effective date of the tariff. The tariff establishes an escalating rate schedule that increases according to the length of storage. The majority view the point of ambiguity as being from what time the length of storage is measured. I agree that the tariff, when applicable, unambiguously requires that the length of storage be measured from the expiration of the initial ten days of free time. Neither the parties nor the majority have come to grips with the principal ambiguity in the tariff, however, which is whether the rates apply at all to one such as Bunge whose term of storage began before the effective date of the tariff.

On its face the tariff is plain enough: after the expiration of ten days of free time storage charges are assessed according to the escalated schedule set forth. The effective date of the tariff is May 6, 1978. The textual ambiguity is whether, under this effective date provision, storage terms already in progress are governed by the new tariff. There are two plausible meanings of the instruction that this tariff takes effect on May 6, 1978. The first is that the tariff controls only storage terms that begin after May 6, in other words, that the effective date governs the "free time" language as well as the rate schedule language. Under this interpretation, which gives only prospective effect to the tariff, Bunge would not be subject to the new tariff at all because its free time (which marks the start of its storage) occurred before the effective date. The second plausible reading is that this tariff governs any assessment of storage fees that occurs after the effective date even though the term of storage might have transpired in part be-

---

1. We note that the increased rate was charged commencing May 6, 1978, the effective date of the tariff. We are *not* dealing with an attempt to charge an increased rate commencing *before* the effective date. We note also that Bunge does not complain of any insufficiency relating to any lack of advance notice of the new tariff.

fore the effective date. Under this retroactive interpretation Bunge would be subject to the increased rates not only for days of storage after May 6 but also for days of storage prior to May 6.

Confusion has arisen in this case because neither of these two interpretations of the tariff and its effective date has been proffered by the parties; rather, each asserts an intermediate interpretation. The Docks Department attempts to apply the new rates to only that portion of Bunge's storage term that extended beyond the effective date but foregoes any attempt to collect the increased rates for days of storage prior to the effective date. Bunge argues that the new schedule should apply to it but only by running anew beginning on the effective date. Neither of these applications that the parties advocate is called for by the tariff's language. The Docks Department is free to collect less than it may be due, and Bunge is free to concede more than it owes, but the court should not be led astray into adopting an initial construction of the tariff that is not suggested by its language.[1]

It might be that once the intended application of the tariff is initially ascertained then that application should be modified to avoid unfairness or unallowable retroactivity. Thus, the parties' interpretations of the tariff are not necessarily unreasonable in a broader sense; they simply are not suggested by the language of the tariff itself. But before deciding which, if either, of the intermediate interpretations advocated by the parties is correct, the principal ambiguity must be resolved.[2]

Resolution of this principal ambiguity should be done initially by the district court because its prior decision was rendered without a clear view of this ambiguity and without the parties having either briefed or argued it. I would, therefore, vacate the

decision of the district court and remand for a hearing on the proper construction of the tariff.

---

1. These tactical efforts by each party to obtain a safe half loaf neither bind nor limit this court, nor should they hypnotize it either. See n.2, *infra*.

2. We are not precluded from adopting an interpretation of the tariff not proffered by the parties. The larger issue of ambiguity has been raised, and in viewing that issue we are not constrained by the parties' respective views of what the ambiguous document means when construed.